IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DANIEL K. RILEY

NO. 1:21-cv-1647

vs.

GEORGE MILLER, et al.

**BRIEF IN SUPPORT OF
MEDICAL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED COMPLAINT OF DEFENDANTS, DR. JOHN
LISIAK, DR. ERIC DEWARREN, AND DR. SCOTT PRINCE**

Defendants, Dr. John Lisiak, Dr. Eric DeWarren, and Dr. Scott Prince, by and

through their attorneys, Weber Gallagher Simpson Stapleton Fires & Newby LLP,

hereby submit the following Brief in Support of their Motion to Dismiss Plaintiff's

Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

I.      **STATEMENT OF THE CASE**

On September 24, 2021, *pro se* Plaintiff, Daniel Riley, an inmate of the

Pennsylvania Department of Corrections ("DOC") filed a Complaint in the Middle

District of Pennsylvania.  He filed an Amended Complaint on February 28, 2022.

(ECF No. 45).  Thereafter, on May 16, 2022, with leave of the Court, Plaintiff filed

a Second Amended Complaint, which serves as the operative pleading in this matter.

(ECF No. 58).  Therein, he asserts claims against Moving Defendants for negligence,

violations of his rights under the Eighth and Fourteenth Amendments pursuant to 42

U.S.C. §1983, and violations of his rights under the American with Disabilities Act and Section 504 of the Rehabilitation Act.[1]

Plaintiff states that, for all times relevant to the Second Amended Complaint, he has been a level 5 inmate housed in either the Restricted Housing Unit ("RHU") or a medical infirmary isolation cell. (ECF No. 58, ¶40). On September 27, 2019, while exercising in the RHU yard at SCI-Waymart, Plaintiff's foot became caught in a hole in the concrete, which caused him to twist his ankle, hit the fence with his head, fall backward onto his back and head, and lose consciousness. (*Id*., ¶¶44, 48). Corrections officers contacted the medical department, and two nurses arrived to the yard with a wheelchair. (*Id*., ¶52). Although Plaintiff was placed in the wheelchair, he was not immediately taken to the medical department; rather, he was assessed in the yard by the nurses and then transported via wheelchair to his cell. (*Id*., ¶53). Notwithstanding his alleged complaints of dizziness and severe pain, the nurses provided him with Tylenol and provided no further treatment. (*Id*., ¶54).

Later that morning at approximately 11:00am, an unidentified nurse came to Plaintiff's cell, provided him with Tylenol for pain, took pictures of his head and

---

[1] Although Plaintiff also raises the claims listed below, these claims are not directed to Moving Defendants and, therefore, they are not addressed herein:
(a) Cause of Action A: Deliberate Indifference / Unsafe Conditions;
(b) Cause of Action C: Retaliation;
(c) Cause of Action D: Poor Prison Living Conditions;
(d) Cause of Action E: Negligence / Unsafe Conditions;
(e) Cause of Action H: Interference with Access to Courts; and
(f) Cause of Action J: Excessive Force.

ankle, examined his back, ordered an ankle X-ray, and advised him to "get some rest, ice will be provided, and to walk it off." (*Id.*, ¶55).

Later that evening, Plaintiff's legs locked up and he began to experience painful back spasms. (ECF No. 45, ¶57). In response, a corrections officer called the medical department, and Plaintiff was removed from his cell via stretcher with the help of medical staff and corrections officers. (*Id.*, ¶58). Although the nursing staff "reported there were no noticeable injuries" he was nonetheless transferred to Wayne Memorial Hospital, where he underwent X-rays and was prescribed Tylenol, Flexeril (a muscle relaxant), Decadron (a corticosteroid), and Ultram (a pain reliever). (*Id.*, ¶59; ECF No. 1-6, p. 3). He was discharged the same evening, and upon his return to the prison, was placed in the medical infirmary. (ECF No. 58, ¶59).

The next morning, at 9:00am, Plaintiff was seen in the prison's infirmary by Dr. Eric DeWarren. (ECF No. 58, ¶60). At that time, Plaintiff reported that he continued to have pain and back spasms, which made it difficult for him to walk. (*Id.*). However, because the tests performed at Wayne Memorial Hospital did not reveal any injuries, Dr. Warren made the decision to discharge Plaintiff back to the

RHU.[2]  (*Id.*, ¶61).  Approximately two hours later, Plaintiff was escorted back to his RHU cell via wheelchair.  (*Id.*, ¶62).

Later that evening, while in the RHU, Plaintiff advised a corrections officer that his legs were locking up and he was experiencing painful back spasms.  (ECF No. 58, ¶63).  When another corrections officer returned at 7:00pm, Plaintiff was advised that he would need to come to his cell door to be handcuffed before the door could be opened for medical assessment.  (*Id.*, ¶¶64-65).  Plaintiff stated that he was unable to stand, and Lt. Martin responded by refusing to provide entry into the cell for the medical staff.  (*Id.*, ¶65).  When Lt. Martin retuned an hour later with medical staff, he again instructed Plaintiff to come to the door to be handcuffed.  (*Id.*, ¶¶66-67).  However, when Plaintiff tried to move to the cell door, he claims that his legs gave out, causing him to fall, striking his head on the door, and losing consciousness.  (*Id.*, ¶68).  This prompted Lt. Martin to order a cell extraction, and Plaintiff was lifted onto his bed, where he was handcuffed and shackled.  (*Id.*, ¶69).  At that time, a nurse came into Plaintiff's cell and administered IV Toradol for pain, and then placed Plaintiff on a stretcher.  (*Id.*, ¶71).

Plaintiff was then taken to Geisinger Medical Center Emergency Room via ambulance.  (ECF No. 48, ¶72).  While at the hospital, Plaintiff underwent CTs and

---

[2] As this Court is likely aware, RHU inmates are confined to their cells for 23 hours per day.  They receive all meals and medications in their cells, and are limited in their ability to engage in activities outside of their cell.

X-rays, and was prescribed Tylenol, Flexeril, Decadron, and Ultram. (*Id*.). Plaintiff was discharged from the hospital the following morning, and upon his return to the prison, was placed in the infirmary. (*Id*., ¶73).

The next day, on September 29, 2019, Plaintiff was seen by Dr. Eric DeWarren, who explained to Plaintiff that the X-rays taken at the two hospitals did not show any fractures. (ECF No. 58, ¶74). Plaintiff alleges that Dr. DeWarren then accused Plaintiff of "faking" his injuries. (*Id*.). When Dr. DeWarren advised Plaintiff of his intention to discharge Plaintiff from the infirmary, Plaintiff purportedly refused to leave. (*Id*., ¶75). Plaintiff remained in the infirmary until October 15, 2019. (*Id*., ¶100).

While in the infirmary, Plaintiff was prescribed medications, although he claims that the corrections officers interfered with the administration of his medication by forcing him to come to his cell door to receive his medications. (ECF No. 58, ¶¶76-80). Plaintiff claims that he overheard a nurse tell a corrections officer that Plaintiff was unable to walk, and the corrections officer responded: "I don't care he's a Level 5 inmate." (*Id*., ¶78). When Plaintiff addressed this issue with Dr. Lisiak a few days later, Dr. Lisiak told him that "he would fix that problem if he can but [the corrections officers who were purportedly interfering with his medication administration] were already aware of [Plaintiff's injuries] & inability to walk or stand." (*Id*., ¶81). Notwithstanding Dr. Lisiak communicating this concern to the

corrections staff, Plaintiff claims that the staff continued to have an indifferent attitude. (*Id.*, ¶82).

Plaintiff also claims that he requested a shower seat from both Dr. Lisiak and CHCA Desiree Hartman, and while they agreed to order one, Plaintiff now alleges that the shower seat did not arrive. (ECF No. 58, ¶¶83-85). As a result, he claims he fell down in the shower on October 3 and 7, 2019. (*Id.*, ¶88).

On October 4, 2019, while still in the infirmary, Plaintiff was seen in physical therapy by Ron Seijack. (ECF No. 58, ¶91). At that time, Dr. John Lisiak and CHCA Hartman told Plaintiff that Mr. Seijack only came to the prison once per month, and that they planned for Plaintiff to be seen by Mr. Seijack once monthly for rehabilitation. (*Id.*). Plaintiff also claims that he asked Dr. Lisiak for an MRI and nerve tests, and although Dr. Lisiak purportedly agreed, these tests were never performed. (*Id.*, ¶¶92-93).

On October 15, 2019, Plaintiff was discharged from the infirmary to the RHU. (ECF No. 48, ¶100). Due to his unstable gait, on October 16, 2019, an order was written that allowed Plaintiff to also use the wheelchair when he was outside his RHU cell; however, Plaintiff claims that he was not given a cane for in-cell movement. (*Id.*, ¶101). In the grievance attached to his Complaint, it was noted that Plaintiff was "evaluated by multiple providers regarding [his] request for a cane"

and "[a]fter evaluation, none of the providers felt that a cane was medically necessary in the cell." Exhibit 1-13, p. 5).

Although Plaintiff was purportedly scheduled to be seen again by the physical therapist on November 1, 2019, he now claims that he was never informed of the physical therapy session and was not escorted to the medical department to attend physical therapy. (ECF No. 58, ¶107). Plaintiff is critical of Dr. Lisiak and CHCA Hartman because it was their "responsibility for [ensuring] that the Plaintiff attend his physical therapy session." (*Id.*, ¶108). He also accuses CHCA Hartman of lying and falsifying documentation in the chart claiming that Plaintiff refused physical therapy services that day. (*Id.*, ¶109).

Over the next several weeks, Plaintiff claims that he was refused proper pain medications; however, he acknowledges that Dr. Lisiak prescribed Ibuprofen, Robaxin, Flexeril, Toradol, and Motrin while Plaintiff was incarcerated at SCI-Waymart. (ECF No. 58, ¶¶120, 123). Additionally, he acknowledges that Dr. Prince ordered Naproxen, Extra Strength Tylenol, Pamelor, and Trileptal while he was incarcerated at SCI-Dallas. (*Id.*, ¶124).

On November 11, 2019, Plaintiff was transferred to SCI-Dallas with his wheelchair. (ECF No. 58, ¶126). Nine days later, on November 20, 2019, Dr. Scott Prince entered an order for Plaintiff to receive *daily* physical therapy treatment walks. (*Id.*, ¶158). Importantly, however, in his grievance records, Plaintiff states

that the order was for *twice weekly* physical therapy walks. (ECF No. 1-7, p. 2-3). Due to his Level 5[3] status, two officers were required to accompany Plaintiff and the nurses on these walks. (ECF No. 58, ¶159). Although Plaintiff acknowledges that Dr. Prince informed the administration and security staff of his order, he claims the administrative and security staff refused to assist the nurses with the prescribed walks. (*Id.*, ¶¶160-162). As a result of staff interference with medical treatment, Plaintiff claims that his rehabilitation process was hindered and delayed. (*Id.*, ¶165). When Plaintiff informed Dr. Prince that the staff was not taking him for physical therapy walks, Dr. Prince purportedly said "he couldn't force them to follow the order[,] all he could do is put the order in." (*Id.*, ¶169). As a result, between November and December 2019, Plaintiff claims he was unable to participate in physical therapy walks at the frequency in which it was ordered. (*Id.*, ¶¶167-168).

On December 13, 2019, Plaintiff was seen for his monthly physical therapy session. (ECF No. 58, ¶170).

On December 27, 2019, Plaintiff was transferred to SCI-Smithfield, and at that point in time, he had no further contact with Moving Defendants. (ECF No. 48, ¶171). While at SCI-Smithfield, Plaintiff continued to receive monthly physical therapy on February 26, 2020 and March 13, 2020. (*Id.*, ¶172). On March 12, 2020, Plaintiff's wheelchair was taken away, and he was given a cane instead. (*Id.*, ¶173).

---

[3] Level 5 inmates are those who require the highest level of security.

Four months later, on July 7, 2020, Plaintiff's cane was taken away, and he was given a back brace. (*Id.*, ¶174).

Plaintiff's Second Amended Complaint must be dismissed because there is no legal basis for his federal and/or state law claims against Dr. John Lisiak, Dr. Eric DeWarren, and Dr. Scott Prince.

## II.   QUESTIONS PRESENTED

1.   Should this Honorable Court dismiss Plaintiff's Second Amended Complaint where Plaintiff has failed to articulate facts sufficient to support an Eighth Amendment claim for deliberate indifference to a serious medical need?

   **Suggested Response: Yes.**

2.   Should this Honorable Court dismiss Plaintiff's Second Amended Complaint where Plaintiff has failed to articulate facts sufficient to support a claim for violations of either the Americans with Disabilities Act or §504 of the Rehabilitation Act?

   **Suggested Response: Yes.**

3.   Should this Honorable Court dismiss Plaintiff's Second Amended Complaint where Plaintiff has failed to file a Certificate of Merit in support of his professional negligence claim?

   **Suggested Response: Yes.**

4.   Should this Honorable Court dismiss Plaintiff's Second Amended Complaint where Plaintiff has failed to articulate facts sufficient to support an equal protection claim under the Fourteenth Amendment?

   **Suggested Response: Yes.**

## III.  __ARGUMENT__

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party, in responding to a pleading, may file a Motion to raise the defense of "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) Motion, the Court must take all the well-pleaded facts in the Complaint and view them in the light most favorable to the Plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969). The Complaint must contain sufficient information to provide the elements of the claim or to permit inferences to be drawn as though those elements exist. Kost v. Kozakiewicz, 1 F.3d 176 (3d Cir. 1993).

The Court should not assume, however, that the Plaintiff can prove fact that he has not alleged. Associated Gen'l Contractors of California v. California State Council of Carpenters, 559 U.S. 519, 526 (1993). If "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," then the Complaint should be dismissed. Hison v. King & Spalding, 467 U.S. 69, 73 (1994).

### A. PLAINTIFF'S SECOND AMENDED COMPLAINT DOES NOT STATE FACTS SUFFICIENT TO SUPPORT AN EIGHTH AMENDMENT CLAIM FOR DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED.

In Causes of Action "B" and "G" of the Second Amended Complaint, Plaintiff states that Moving Defendants were deliberately indifferent to a serious medical

need in violation of the Eighth Amendment. (ECF No. 58, Causes of Action "B" and "G").

Specifically, Plaintiff alleges that Dr. Eric DeWarren accused Plaintiff of faking his injuries on September 29, 2019 and thereafter refused to prescribe proper pain medication. (*Id.*, ¶¶74).

With respect to Dr. Lisiak, Plaintiff alleges that he (1) failed to intervene on his behalf in order to stop the corrections officers from interfering with medication administration; (2) failed to provide Plaintiff with a shower seat; (3) failed to order additional diagnostic tests to evaluate Plaintiff's injury; (4) failed to ensure that Plaintiff was seen for physical therapy on November 1, 2019; and (5) failed to provide Plaintiff with adequate pain medication. (*Id.*, ¶¶81, 83-85, 92-93, 108, 120, 123).

With respect to Dr. Prince, Plaintiff alleges that he failed to ensure that the corrections staff carried out his orders for physical therapy treatment walks. (*Id.*, ¶¶160-162).

It is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. N.J. 1990). The United States District Court for the Eastern District of Pennsylvania has held, in a similar context: "The court will not allow plaintiff to substitute his desires and opinions for the professional judgment of prison officials,

especially when the law of the circuit makes clear that considerable deference is to be afforded to the judgment of the correctional authorities." Iseley v. Dragovich, 236 F. Supp. 2d 472, 478 (E.D. Pa. 2002). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D. Pa., Oct. 13, 2000) ("courts have consistently rejected Eight Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. *See e.g.*, Brown v. Borough of Chambesburg, 903 F.2d 274, 278 (3d. Cir. 1990) ('[A]'s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')." Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997). Applying this exact standard, courts have frequently rejected Eighth Amendment claims that are based on the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. Additionally, the Eighth Amendment does not require that a prisoner receive every medical treatment that he

requests or that is available elsewhere. <u>Banks v. Mozingo</u>, 2010 U.S. Dist. LEXIS 25611, *61 (W.D. Pa., Feb. 26, 2010).

In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional medical judgment. <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F. 2d 754, 762 (3d Cir. 1979) (*quoting* <u>Bowring v. Godwin</u>, 551 F.2d 44, 48 (4th Cir. 1977)). Additionally, "[a] court may not substitute its own judgment for diagnosis and treatment decisions made by prison medical staff members." <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979); <u>Maynard v. New Jersey</u>, 719 F. Supp. 292, 295 (D.N.J. 1989).

> i. *Allegation that Dr. DeWarren accused Plaintiff of faking his symptoms.*

In his Second Amended Complaint, Plaintiff avers that he was seen by Dr. Eric DeWarren on September 29, 2019 – two days after his purported fall in the RHU yard. (ECF No. 58, ¶74). During this visit, Dr. DeWarren reviewed the X-rays taken during Plaintiff's two recent hospitalizations, and explained to Plaintiff that the X-rays did not show any evidence of fracture or acute injury. (*Id*.). Plaintiff is critical of this encounter inasmuch as he claims Dr. DeWarren accused him of "faking" his injuries. (*Id*.).

At best, Plaintiff has argued that Dr. DeWarren honestly believed – based upon the representations of the emergency medicine specialists at two different hospitals that treated Plaintiff and based upon the results of X-rays and CT scans taken at both hospitals – that Plaintiff did not suffer from a significant injury during his fall on September 27, 2019. Dr. DeWarren's alleged failure to recognize the purported gravity of Plaintiff's injuries is not actionable under the Eighth Amendment. The courts have held that a misdiagnosis is, at best, medical negligence. *See*, Estelle, 429 U.S. at 105-06 ("A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"). Moreover, a misdiagnosis necessitates that Dr. DeWarren did, in fact, evaluate Plaintiff by reviewing the hospital records and radiographic reports. Plaintiff simply disagreed with his (and the hospital's) diagnosis. Here, the records show that Dr. DeWarren reviewed the notes from Plaintiff's hospitalizations on September 27, 2019 and September 28, 2019, which included the X-rays and CT scans taken at those hospitals. Plaintiff does not dispute that the films did not reveal a fracture and has offered no evidence to suggest that the injuries he sustained were subsequently determined to be anything other than a mere sprain or strain.

To the extent that Dr. DeWarren believed that Plaintiff was faking his injuries, this too is not actionable. Any such belief, even in error, does not evidence deliberate

indifference, but merely negligence. Ammons v. Altergot, 968 F.2d 1218, 1992 U.S. App. LEXIS 16172, 1992 WL 157551, at *3 (7th Cir. July 8, 1992)(Nurse "Altergot's belief that Ammons was malingering if honest but erroneous, . . . would not amount to the deliberate or even reckless infliction of punishment and so would not be actionable under the Constitution")(internal quotations omitted); Price v. Cooper, NO. 94 C 5142, 1996 U.S. Dist. LEXIS 11727, 1996 WL 467242, at *3 (N.D. Ill. Aug. 12, 1996) ("If medical personnel do not respond to complaints of pain, they are not liable if they honestly believed the inmate was malingering"). It is disputed that Dr. DeWarren accused Plaintiff of malingering and/or faking his injuries; however, assuming *arguendo* that he did, Plaintiff's Second Amended Complaint shows that any such belief did not interfere with the medical care that he received. Plaintiff states that, notwithstanding Dr. DeWarren's alleged statements, Plaintiff was not discharged from the prison infirmary that day. In fact, he remained in the infirmary for an additional two weeks through October 15, 2019. (ECF No. 58, ¶¶75, 100). While in the infirmary and in the RHU, Plaintiff was permitted to utilize a wheelchair for ambulation, he received physical therapy, and he continued to receive pain medications. (*Id.*, ¶¶91, 101, 120, 123). In this context, Plaintiff's allegations against Dr. DeWarren fail as a matter of law and his Second Amended Complaint should be dismissed.

ii.   *Allegation that Dr. DeWarren and Dr. Lisiak refused to prescribe "proper" medication for Plaintiff's pain.*

In his Second Amended Complaint, Plaintiff acknowledges that he was prescribed a myriad of medications at SCI-Waymart to address his pain, including Ibuprofen, Robaxin, Flexeril, Toradol, and Motrin.  (ECF No. 58, ¶¶120, 123).  However, he is critical of Dr. DeWarren and Dr. Lisiak for failing to prescribe "proper" medications to address his pain. (*Id.*).  Although he does not elaborate on what he means by "proper", counsel presumes Plaintiff is dissatisfied that stronger pain medication was not prescribed to address his sprained ankle, and back and neck sprain/strain, and/or "possible" nerve damage.  In addition to prescribing pain medications, while at SCI-Waymart, Plaintiff was housed in the infirmary to monitor his condition, he was provided with a wheelchair for ambulation, and he was signed up for physical therapy.  (*Id.*, ¶¶75, 91, 100-101).

This case is indistinguishable on its salient facts from cases in which prisoners had disagreements with their physicians regarding their treatment, and in which they ask the courts to substitute the wishes of the prisoners regarding their treatment for the considered medical judgment of their doctors.  Such a claim is not actionable under the Eighth Amendment.

The Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere.  Banks v. Mozingo, 2010 U.S. Dist. LEXIS 25611 (2010); Layne v. Vinzant, 657 F.2d 468, 473 (1st Cir. 1981)

(holding that a disagreement as to the appropriate choice of medical treatment does not give rise to a constitutional violation because the "right to be free from cruel and unusual punishment does not include the right to the treatment of one's choice"); Young v. Quinlan, 960 F.2d 351, 358 n.18 (3d Cir. 1992) (finding that mere disagreements over medical judgment do not state Eighth Amendment claims, as there are typically several acceptable ways to treat an illness).

This is especially true as it pertains to medication choices. See, e.g., Rochell v. Corr. Med. Servs., No. 4:05CV268, 2006 U.S. Dist. LEXIS 37943, at *10 (N.D. Miss. April 10, 2006) ("The constitution does not . . . guarantee pain-free medical treatment . . . . While the plaintiff might have preferred stronger medication, his mere disagreement with his medical treatment does not state a constitutional claim"); Thomas v. Coble, 55 F. App'x 748, 749 (6th Cir. 2003) (summary judgment properly granted to prison physician despite inmate's disagreement with physician over adequacy of pain medication and allegation that he suffered in excruciating pain for six months); Goodson v. Browne, No. 6:05cv4, 2005 U.S. Dist. LEXIS 33900, at *9 (E.D. Tex. Apr. 29, 2005) (no deliberate indifference by prison doctor who prescribed inmate pain medications that were not the narcotic medications the inmate specifically requested and which the inmate claimed were ineffective because "there is no constitutional right to a non-existent miracle cure"); Gause v.

Diuglielmo, 339 F. App'x 132 (3d Cir. 2009) (dispute over choice of medication does not rise to the level of an Eighth Amendment violation).

Courts have consistently held that the exercise by a doctor of his professional judgment does not constitute deliberate indifference and that an inmate's dissatisfaction with a course of medical treatment entails nothing more than a disagreement over alternate treatment plans. *See e.g.,* Innis v. Wilson, 334 F. App'x 454 (3d Cir. 2009) (prisoner's disagreement with the treatment offered by medical officials and his assertions that a different type of medical care might be more effective did not state a claim for relief). Moreover, "courts will not 'second-guess the propriety or adequacy of a particular course of treatment [which] remains a question of sound professional judgment.'" Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

Ultimately, Plaintiff has failed to plead facts sufficient to maintain a §1983 action as it pertains to his desire for stronger pain medications. At best, he disagrees with his medical provider's judgment regarding pain management. Accordingly, Plaintiff's Second Amended Complaint should be dismissed with prejudice.

        *iii.    Allegation that Dr. Lisiak failed to provide Plaintiff with a shower seat.*

In his Second Amended Complaint, Plaintiff claims that he requested a shower seat from both Dr. Lisiak and CHCA Desiree Hartman, and while they agreed to order one, Plaintiff now alleges that the shower seat was not ordered and/or

not received in the one month that he remained at SCI-Waymart. (ECF No. 58, ¶¶83-85). It is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103 (3d Cir. N.J. 1990). The United States District Court for the Eastern District of Pennsylvania has held, in a similar context: "The court will not allow plaintiff to substitute his desires and opinions for the professional judgment of prison officials, especially when the law of the circuit makes clear that considerable deference is to be afforded to the judgment of the correctional authorities." Iseley v. Dragovich, 236 F. Supp. 2d 472, 478 (E.D. Pa. 2002). Additionally, "[a] court may not substitute its own judgment for diagnosis and treatment decisions made by prison medical staff members." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); Maynard v. New Jersey, 719 F. Supp. 292, 295 (D. N.J. 1989).

As the Seventh Circuit has noted, "the Eighth Amendment does not guarantee that an inmate receive specific treatment; it guarantees only 'reasonable measures to meet a substantial risk of serious harm.'" DeBoer v. Luy, 70 Fed. Appx. 880, 883 (7th Cir. 2003); Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). "The Eighth Amendment does not prohibit a prison doctor from exercising his own independent medical judgment regarding an appropriate medical treatment, and a prisoner's mere disagreement with a doctor's medical judgment concerning treatment does not support a claim of cruel and unusual punishment." Id.

Here, although Plaintiff purportedly was not given a shower seat, the records show that he was housed in the infirmary between September 29, 2019 and October 15, 2019, where he had access to the handicapped showers that are a staple of the infirmary and had access to a wheelchair if needed. (ECF No. 48, ¶¶75, 100). Moreover, as Plaintiff acknowledges in his Second Amended Complaint, Dr. Lisiak agreed to order a shower seat; however, it appears it did not arrive prior to Plaintiff's transfer back to the RHU on October 15, 2019. Although Plaintiff is upset that he did not receive a shower seat, there is no indication in the Second Amended Complaint that Dr. Lisiak <u>refused</u> this request or that he took any action to prevent Plaintiff from receiving it. Therefore, his claims against Dr. Lisiak must fail as a matter of law.

      iv.    *Allegation that Dr. Lisiak failed to order additional diagnostic tests to evaluate his injury.*

In his Second Amended Complaint, Plaintiff alleges that he asked Dr. Lisiak for an MRI and nerve tests in or around October 4, 2019. (ECF No. 58, ¶¶92-93). Although Dr. Lisiak agreed to order these tests, Plaintiff claims they were not performed in the one month prior to his transfer.

Importantly, Plaintiff acknowledges that he was seen at two hospitals (Wayne Memorial Hospital and Geisinger Medical Center) on September 28, 2019 and September 29, 2019. (*Id*., ¶¶59, 72). At both facilities, various diagnostic tests were performed, which failed to reveal any significant injuries. (*Id*.). And, more

importantly, Plaintiff has not stated that any specialist at either Wayne Memorial Hospital or Geisinger Medical Center recommended additional studies. (*Id*.). Thus, when Plaintiff requested an MRI and nerve test one week later, this was based on nothing more than Plaintiff's frustration that his "sprain/strain" had not yet resolved.

In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the United States Supreme Court found that "the question of whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Id*. The Court stated that "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice . . . ." *Id*. Similar to Estelle, in the instant matter, Dr. Lisiak used his medical judgement to determine that Plaintiff did not require an MRI or nerve study at that exact point in time. Indeed, even if it had been ordered, it is unlikely that it could have been carried out in the month prior to Plaintiff's transfer. Once Plaintiff was transferred, his symptoms improved with physical therapy and medication, and there is no indication in the Second Amended Complaint that any subsequent provider contemplated additional testing. Accordingly, Plaintiff has not alleged any facts to support a claim for deliberate indifference and his Second Amended Complaint must be dismissed.

*Allegation that Dr. Lisiak failed to ensure that he received physical therapy.*

In his Second Amended Complaint, Plaintiff no longer accuses Dr. John Lisiak of falsifying the medical record to reflect that Plaintiff refused physical therapy on November 1, 2019 (rather, he attributes any falsification to CHCA Hartman). (ECF No. 58, ¶109). He is, however, critical of Dr. Lisiak because he claims it was his "responsibility for [ensuring] that the Plaintiff attend his physical therapy session." (*Id.*, ¶108). Importantly, Plaintiff has offered no facts to suggest that Dr. Lisiak had the *mens rea* to be deliberately indifferent to Plaintiff's medical needs. To the contrary, the Second Amended Complaint indicates that Dr. Lisiak entered the order for Plaintiff to receive physical therapy, and Plaintiff attended one physical therapy session on October 4, 2019. (*Id.*, ¶91). At or around that time, Dr. Lisiak explained to Plaintiff that the physical therapist only came to the prison once per month, and therefore, he planned for Plaintiff to be seen every month for rehabilitation. (*Id.*). Unfortunately, for reasons not explained by Plaintiff's Complaint (other than to state that CHCA Hartman falsely documented that Plaintiff failed to appear for his **scheduled** physical therapy session), Plaintiff's next physical therapy session on November 1, 2019 was cancelled. (*Id.*, ¶107). Since Plaintiff was transferred to a new prison just days later, (*Id.*, ¶126), he was not seen again by physical therapy at SCI-Waymart. He did, however, resume physical therapy at SCI-Dallas, and thereafter at SCI-Smithfield. (*Id.*, ¶¶170, 172).

Importantly, Plaintiff's Second Amended Complaint shows that Dr. Lisiak ordered physical therapy, and it was scheduled for November 1, 2019. Although Plaintiff was ultimately not seen on November 1, 2019, Plaintiff has not pled any facts to suggest that Dr. Lisiak was involved in the cancellation of the physical therapy session that day. Therefore, Plaintiff is unable to make out a claim for deliberate indifference against Dr. Lisiak, and his Second Amended Complaint must be dismissed as a matter of law.

vi. *Allegation that Dr. Prince and Dr. Lisiak failed to intervene to ensure corrections officers complied with their orders.*

Next, Plaintiff has alleged that Dr. Lisiak and Dr. Prince failed to intervene to ensure that their medical orders were carried out by the corrections staff.

With respect to Dr. Lisiak, the Second Amended Complaint alleges that corrections officers interfered with the administration of Plaintiff's medication while he was in the infirmary at SCI-Waymart. (ECF No. 58, ¶¶76, 80). When he addressed this issue with Dr. Lisiak, Dr. Lisiak told him that "he would fix that problem if he can but [the corrections officers who were purportedly interfering with his medication administration] were already aware of [Plaintiff's injuries] & inability to walk or stand." (*Id.*, ¶81). Notwithstanding Dr. Lisiak communicating this concern to the corrections staff, Plaintiff claims that they continued to have an indifferent attitude. (*Id.*, ¶82).

With respect to Dr. Prince, the Second Amended Complaint avers that Dr. Prince entered an order for Plaintiff to receive physical therapy treatment walks at SCI-Dallas. (ECF No. 45, ¶158). Importantly, although Plaintiff states within his Second Amended Complaint that these walks were supposed to occur daily, in his grievance records, Plaintiff acknowledges that they were to occur twice weekly. (ECF No. 1-7, p. 2-3). In this context, the Second Amended Complaint suggests that Plaintiff was assisted approximately once weekly for these walks, (*Id*., ¶¶167-168), and was seen by physical therapy in the interim, (*Id*., ¶170). Although the walks did not occur at the frequency in which Dr. Prince ordered, there were certainly attempted.

Importantly, Plaintiff alleges that Dr. Prince and Dr. Lisiak's orders were not carried out ***because of the actions of the corrections officers***. Specifically, Plaintiff states that, due to his Level 5 status, the corrections officers at SCI-Waymart demanded that he come to his cell door to retrieve his medications. (ECF No. 58, ¶¶76, 80). His level 5 status also contributed to the purported interference in Dr. Prince's orders at SCI-Dallas. Due to his heightened security status, two corrections officers were required to accompany him and the nurses on the ordered physical therapy treatment walks. (*Id*., ¶159). Although Plaintiff acknowledges that Dr. Prince informed the administration and security staff of his order, Plaintiff now avers that the corrections officers simply refused to assist the nursing staff and, as a result,

he did not participate in physical therapy walks in the frequency that they were ordered. (*Id.*, ¶¶160-162). When he informed Dr. Prince of the corrections officers' actions, Dr. Prince purportedly said "he couldn't force them to follow the order[,] all he could do is put the order in." (*Id.*, ¶169). Indeed, Dr. Prince is correct: if corrections officers are not willing or available to carry out medical directives, he – as a contract employee – has no authority to reassign DOC employees from one assignment to another.

As contract medical professionals, Dr. Prince and Dr. Lisiak do not have any control over DOC employees. Although they can write orders for medical treatment, they cannot force the prison to comply with those orders. In short, Dr. Prince and Dr. Lisiak are Plaintiff's treating physicians; they not the Superintendents. "A doctor associated with a prison cannot be held responsible for failing to intercede in the treatment of a prisoner simply because the prisoner button-holes him and insists that he do so." Cuoco v. Moritsugu, 222 F.3d 99, 111 (2d Cir. N.Y. 2000). This is essentially a "failure to intervene" claim, asserting that Moving Defendants had a duty to make sure that the prison guards carried out medical orders. Dr. Prince and Dr. Lisiak are not required to become corrections officers and intervene if there is an excessive use of force, Smith v. Donate, 2012 U.S. Dist. LEXIS 72506, 18, 2012 WL 1899323 (M.D. Pa. 2012); and they are not required to hunt down corrections

officers to carry out their orders either. Thus, Plaintiff's claims against Moving Defendants must be dismissed.

### vii. *Lack of Involvement in Cause of Action "G"*

In Cause of Action "G" of his Second Amended Complaint, Plaintiff claims that "all Defendants" are liable for the enumerated issues identified between paragraph 263 and 271. However, within his factual recitation, the only event in which Plaintiff contends the Moving Defendants were personally involved was with respect to his shower chair request (which is addressed *supra*). (ECF No. 58, ¶268). Plaintiff has not provided any factual support to suggest that Dr. Lisiak, Dr. DeWarren, or Dr. Prince were involved in any of the below events:

1. Being "complicit" in the deterioration of the RHU yard at SCI-Waymart;

2. Allowing Plaintiff to participate in outdoor exercise at SCI-Waymart in a dangerous environment;

3. Denying Plaintiff his one hour of exercise "on multiple occasions" at SCI-Waymart and SCI-Dallas;

4. Denying Plaintiff access to showers, personal property, legal paperwork, law library, and basic necessities at SCI-Dallas;

5. Forcing Plaintiff to live in a cold cell at SCI-Dallas;

6. Interfering with medical orders; and

7. Subjecting Plaintiff to "multiple torture methods."

(*Id*., ¶¶263-269).

Because Plaintiff has failed to plead the personal involvement of Moving Defendants, these claims must be dismissed. In order to advance a § 1983 claim against an individual, an inmate must show, via the complaint's allegations, that the defendant was personally involved in the events of occurrences that underlie a claim. Zerbe v. Karnes, No. 4:07-cv-413, 2008 WL 220414 at *4 (M.D. Pa. Jan. 25, 2008). Personal involvement can be shown through allegations of personal direction or actual knowledge and acquiescence. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Allegations of participation of actual acquiescence, however, must be made with appropriate particularity. *Id*. at 1207-08 (*citing* Boykins v. Ambridge Area Sch. Dist., 621 F.2d 75, 80 (3d Cir. 1980) (civil rights complaint adequate where it states time, place, and persons responsible)).

In the instant matter, Plaintiff does not suggest that Moving Defendants were involved in any aspect of the aforementioned events, and in fact, attributes liability directly to the DOC and its staff. Moving Defendants are not employed by the DOC and have no control over the DOC's nursing and corrections staff, and thus, any claim for liability with regard to the above claims cannot be imputed onto them. Accordingly, Defendants' Motion to Dismiss should be granted.

## B. PLAINTIFF'S SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM AS A MATTER OF LAW AGAINST MOVING DEFENDANTS UNDER EITHER TITLE II OF THE ADA OR §504 OF THE REHABILITATION ACT.

In Cause of Action K of his Second Amended Complaint, Plaintiff asserts a claim against Moving Defendants under the Americans With Disabilities Act and Section 504 of the Rehabilitation Act. (ECF No. 58, ¶¶287-288). Defendants address Plaintiff's ADA and Rehabilitation Acts claims together, as the legal basis is the same and Courts usually consider such claims together.[4] Defendants move to dismiss these counts because the law does not provide a cognizable cause of action against Dr. John Lisiak, Dr. Eric DeWarren, and Dr. Scott Prince for violation of either statute.

Title II of the ADA provides, in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132; Doe v. County of Centre, 242 F.3d 437, 446 (3d Cir. 2001); Spencer v. Courtier, 552 Fed. Appx. 121, 125 (3d Cir. 2014); Brown v. Deparlos, 492 Fed. Appx. 211, 215 (3d Cir. 2012). To state a claim under the ADA, a plaintiff

---

[4] "Although the language of the ADA and Rehabilitation Act differs, the standards for determining liability under the two statutes are identical." McDonald v. Pennsylvania, 62 F.3d 92, 94 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same") Bowers v. NCAA, 475 F.3d 524, 535 n.12 (3d Cir. 2007)

must show that (1) he has a disability; (2) he was excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. Matthews v. Pa. Dept. of Corrections, 613 Fed. Appx. 163, 167 (3d Cir. 2015), citing 29 U.S.C. § 794 and 42 U.S.C. § 12132.

The class of defendants against whom a claim may be brought for a violation of either Title II of the ADA is limited. "The Court of Appeals for the Third Circuit has found that there is generally no individual liability under the ADA." Emerson v. Thiel College, 296 F.3d 184, 189 (3d Cir. 2002) ("individuals are not liable under Titles I and II of the ADA"). It is well-established that Title II of the ADA does not provide for private causes of action against an individual, particularly those individuals employed by a private corporation contracted by the DOC to provide medical services to state prisoners. See, Edison v. Doublerly, 604 F.3d 1307, 1310 (11th Cir. 2010) ("a private corporation is not a public entity merely because it contracts with a public entity to provide some service"); Green v. City of New York, 465 F.3d 65, 79 (2d Cir. 2006) (holding that a private hospital performing government services by contract is not an "instrumentality" of the government); Cox v. Jackson, 579 F.Supp. 2d 831, 852 (E.D. Mich. 2008) (holding that a private medical provider with a contract to serve a prison was not a government entity).

In <u>Matthews v. Pa. Dept. of Corrections</u>, plaintiff, a former prisoner of the DOC, brought an action against the DOC and prison medical providers for the alleged failure to accommodate his tendinitis while he was incarcerated. 613 Fed. Appx. 163 (3d Cir. 2015). The United States Court of Appeals for the Third Circuit ultimately found that plaintiff's statutory claims under Title II of the ADA against the contract medical providers were properly dismissed as they were not a "public entity" as contemplated by both Acts. *Id.*

Additionally, as another Court in this Circuit has observed:

Title II of the ADA validly abrogates state sovereign immunity insofar as it creates a private cause of action for damages against the *States* for conduct that actually violates the Fourteenth Amendment." <u>United States v. Georgia</u>, 546 U.S. 151, 126 S. Ct. 877, 163 L. Ed. 2d 650 (2006) (*emphasis* added). However, as noted earlier, it is clear that Plaintiff has lodged her claims specifically at individual state judicial defendants — in their official capacity — in this matter.

\* \* \* \*
. . . [I]ndividuals, sued in their official capacities, are not "public entities" under the ADA and are not subject to liability thereunder. *See*, <u>Emerson v. Thiel College</u>, 296 F.3d 184, 189 (3d Cir. 2002).

<u>Fidanzato v. Somerset</u>, 2012 U.S. Dist. LEXIS 140332, at \*24-25 (D.N.J. 2012).

*See also*, <u>Morrison v. Danberg</u>, 2010 U.S. Dist. LEXIS 40740, at \*9 (D. Del. 2010) ("Title II of the ADA does not provide for a cause of action against government employees in their individual capacities"); <u>Emerson</u>, *supra* at 189 (3d Cir. 2002) ("This result comports with decisions of other courts of appeals holding that

individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively").

Here, Plaintiff clearly attempts to pursue a private cause of action under Title II of the ADA and §504 of the Rehabilitation Act against Moving Defendants in their official capacities; however, this must fail as a matter of law because Dr. Lisiak, Dr. DeWarren, and Dr. Prince are not recognized as proper defendants under either Act, i.e. they are individuals employed by a private entity. Accordingly, Moving Defendants move to dismiss both the ADA and §504 claims asserted against them.

### C. PLAINTIFF'S CLAIM FOR PROFESSIONAL NEGLIGENCE MUST BE DISMISSED BECAUSE HE HAS FAILED TO FILE A CERTIFICATE OF MERIT.

In Cause of Action "F" of Plaintiff's Second Amended Complaint, Plaintiff states that Dr. Lisiak and Dr. DeWarren[5] were negligent. (ECF No. 58, ¶¶248-262). However, this claim must be dismissed inasmuch as Plaintiff failed to produce a Certificate of Merit pursuant to the Pennsylvania Rules of Civil Procedure.[6] Rule 1042.3(a)(1) requires a plaintiff in a medical malpractice action against a licensed professional to file a certificate of merit with the complaint or within sixty days thereafter attesting that "an appropriate licensed professional has supplied a written

---

[5] Notably, he does not raise a negligence claim against Dr. Prince.

[6] The Third Circuit has held that Rule 1042.3 is substantive law that must be applied by federal courts under <u>Eerie R.R. v. Thompkins</u>, 304 U.S. 64 (1983). <u>Liggon-Redding v. Estate of Sugarman</u>, 659 F.3d 258, 262-4 (3d Cir. 2011).

statement that there exists a reasonable probability that the [medical service described] in the complaint fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm." Moreover, under Rule 1042.3(e), where a certificate of merit is not signed by an attorney, the signing party must attach to the certificate the written statement obtained from the licensed professional.

A "health care provider" under section 503 of the MCare Act is considered to be a "licensed professional" for purposes of Rule 1042.3. Dr. Lisiak and Dr. DeWarren are physicians licensed by the Commonwealth of Pennsylvania who provide medical care to inmates in the Commonwealth. Therefore, they are healthcare providers as defined by 40 P.S. §1303.503. Plaintiff did not file a Certificate of Merit with his Complaint or thereafter, notwithstanding Defendants' 30-Day Notice to Plaintiff pursuant to Rule 1042.6. Accordingly, dismissal of Plaintiff's negligence claim is proper.

### D. PLAINTIFF HAS FAILED TO PLEAD FACTS SUFFICIENT TO SUPPORT A CLAIM FOR VIOLATIONS OF HIS EQUAL PROTECTION RIGHTS UNDER THE FOURTEETH AMENDMENT.

In Cause of Action "I" of the Second Amended Complaint, Plaintiff avers that "all Defendants" violated his rights under the equal protection clause of the Fourteenth Amendment. (ECF No. 58, ¶¶279-284). Although Plaintiff generally states that the Defendants collectively treated him "differently th[a]n inmates in

similar situations," he does not introduce any facts to suggest what other inmates were treated differently, or even whether this difference in treatment was based upon a personal classification protected by the Constitution.

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, §1. The Equal Protection Clause announces the "fundamental principle" that "the State must govern impartially," New York City Transit Auth. v. Beazer, 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979), and "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

In order for a prisoner to succeed on an equal protection claim, the inmate must show "an intentional or purposeful discrimination by defendants." Wilson v. Schillinger, 761 F.2d 921, 929 (3d. Cir. 1985). This state of mind requirement applies equally to claims involving discrimination on the basis of race, religion, gender, alienage or national origin; (2) the violation of fundamental rights; and (3) classifications based on social or economic factors. See, e.g., Britton v. City of Erie, 933 F. Supp. 1261, 1266 (W.D. Pa. 1995), aff'd 100 F.3d 946 (3d Cir. 1996). In addition, the inmate must show that he was similarly situated to, and treated differently than, other inmates at the prison. Sarnoski v. Lackawanna Cnty. Prison,

No. 3:CV-12-0499, 2012 U.S. Dist. LEXIS 45897, 2012 WL 1107651, at *3 (M.D. Pa. 2012).

Here, Plaintiff does not offer specific examples of being discriminated against by Moving Defendants, nor does he identify any specific occasions where others similarly situated were being treated differently due to their race, nationality, religion, etc. Moreover, Plaintiff has offered no facts within his Second Amended Complaint to show that the decision regarding how to treat his injury was based upon the personal animus of Moving Defendants.

Ultimately, Plaintiff's claims of discrimination are based upon mere speculation and cannot be supported as a matter of law. Therefore, any and all claims asserted against Dr. Lisiak, Dr. DeWarren, and Dr. Prince regarding an alleged violation of the Fourteenth Amendment should be dismissed.

## IV.     **<u>CONCLUSION</u>**

For the reasons stated herein, Plaintiff's Second Amended Complaint must be dismissed as to Moving Defendants, Dr. John Lisiak, Dr. Eric DeWarren, and Dr. Scott Prince.

Respectfully submitted,

WEBER GALLAGHER SIMPSON STAPLETON
FIRES & NEWBY LLP

BY:   /s/ Keanna A. Seabrooks
   Keanna A. Seabrooks, Esquire
   kseabrooks@wglaw.com
   PA324714

   Samuel H. Foreman, Esquire
   sforeman@wglaw.com
   PA77096

   Six PPG Place
   Suite 1130
   Pittsburgh, PA 15222
   (412) 281-4541
   (412) 281-4547 FAX

   *Counsel for Defendants, Dr. John Lisiak,*
   *Dr. Eric DeWarren, and Dr. Scott Prince*

Date: October 31, 2024

## <u>CERTIFICATE OF WORD COUNT</u>

I, Keanna A. Seabrooks, Esquire, hereby certify that this Brief has a word count of **7,801 words**.

**WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY, LLP**

By:   /s/ Keanna A. Seabrooks
             Keanna A. Seabrooks, Esquire
             kseabrooks@wglaw.com
             PA324714

             Samuel H. Foreman, Esquire
             sforeman@wglaw.com
             PA77096

             Six PPG Place
             Suite 1130
             Pittsburgh, PA 15222
             (412) 281-4541
             (412) 281-4547 FAX

## CERTIFICATE OF SERVICE

I, Keanna A. Seabrooks, Esquire, hereby certify that on this date a true and correct copy of the foregoing **BRIEF IN SUPPORT OF MEDICAL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT** was served on the attorneys of record *via* CM/ECF electronic filing and to the following:

*By U.S. first class mail only to:*

Daniel K. Riley, #LS-2481
Smart Communication/PA DOC
SCI-Rockview
P.O. Box 33029
St. Petersburg, FL 33733

*Pro Se Plaintiff*

*/s/ Keanna A. Seabrooks*
Keanna A. Seabrooks, Esquire

Dated: October 31, 2024