**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL RILEY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:21-cv-01647** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **GEORGE MILLER, <u>et al.</u>,** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983 in which pro se Plaintiff Daniel Riley ("Riley"), alleges violations of his civil rights arising from an accident he suffered during outdoor recreation. Presently before the Court are Defendants' motions to dismiss Riley's second amended complaint and three pending procedural motions filed by Riley. (Doc. Nos. 98–99, 103–05.) For the reasons that follow, the motion to dismiss filed by Defendants DeWarren, Lisiak, and Prince ("Medical Defendants") will be granted, the other motion to dismiss will be denied, Plaintiff's motions will be denied, the claims against Defendants Pennsylvania Department of Corrections ("DOC") and Wetzel will be dismissed pursuant to a screening review, and the Court will set a case management schedule to govern this case.

## I.    PROCEDURAL HISTORY

Riley filed the complaint that initiated this case on September 24, 2021. (Doc. No. 1.) Defendants moved to dismiss the original complaint, and in response Riley moved for leave to file an amended complaint. (Doc. Nos. 22, 32, 35.) The Court granted the motion for leave to amend on January 28, 2022. (Doc. No. 38.) Riley filed an amended complaint on February 28, 2022. (Doc. No. 45.) The Medical Defendants again moved to dismiss the complaint, and Riley responded by filing a motion for leave to file a second amended complaint. (Doc. Nos. 49, 53.)

The Court granted the motion for leave to amend on May 16, 2022, and Riley's second amended complaint, which remains his operative complaint, was docketed that day.  (Doc. Nos. 57–58.) Defendants moved to dismiss the second amended complaint on May 23, 2022, and June 16, 2022.  (Doc. Nos. 60, 64.)

On July 18, 2022, Riley moved to stay the case because he had recently been transferred between prisons and his legal materials had not yet arrived from his previous institution.  (Doc. No. 68.)  The Court granted the motion on July 19, 2022, and directed Plaintiff to move to lift the stay within thirty days of receiving his legal material from his former institution.  (Doc. No. 69.)

The case remained stayed for over a year until the Medical Defendants moved to lift the stay on September 28, 2023, noting that Riley had not taken any action to move the case forward since the stay had been imposed.  (Doc. No. 73.)  The Court granted the motion to lift the stay on October 23, 2023, lifted the stay, directed Riley to respond to the motions to dismiss, and stated that if Riley continued to fail to take action Defendants could move to dismiss the case for failure to prosecute.  (Doc. No. 75.)

After the stay was lifted, Riley repeatedly moved for extensions of time to respond to the motions to dismiss, noting that he remained unable to litigate the case because he had still not received his legal materials.  (Doc. Nos. 80, 85, 87–89.)  The Court, noting Riley's apparent inability to litigate the case and the administrative costs to the Court and the Defendants of the case remaining open, issued an order on March 15, 2024, that stayed and administratively closed the case, denied the motions to dismiss without prejudice, directed Riley to file regular status reports on his efforts to obtain his legal documents, and stated that Defendants could file renewed motions to dismiss after the stay was lifted.  (Doc. No. 90.)

Riley moved to lift the stay on August 26, 2024, and the Court granted the motion on September 17, 2024.  (Doc. No. 97.)  Defendants filed renewed motions to dismiss on October 17, 2024.  (Doc. Nos. 98–99.)  Riley filed a motion for leave to amend, a motion for extension of time, and a motion for leave to file a certificate of merit relating to his malpractice claim on November 26, 2024.  (Doc. Nos. 103–05.)  Later that day, however, the Medical Defendants filed a suggestion of bankruptcy and motion to stay, noting that their employer during the relevant period, Wellpath LLC ("Wellpath"), had filed for voluntary bankruptcy relief in the United States Bankruptcy Court for the Southern District of Texas ("the Bankruptcy Court") and that the case was therefore subject to an automatic stay under 11 U.S.C. § 362(a)(1).  The Court granted the motion to stay on March 24, 2025, and stayed and administratively closed the case. (Doc. No. 112.)

On July 22, 2025, the Court took judicial notice that the Bankruptcy Court had approved Wellpath's plan of reorganization and accordingly lifted the stay.  (Doc. No. 114.)  The case was then stayed again, however, from August 21, 2025, to September 22, 2025, pursuant to a standing order from Chief United States District Judge Matthew W. Brann due to a cyberattack affecting the Pennsylvania Office of the Attorney General.  See In re Pa. Att'y Gen.'s Office Cyberattack, No. 2025-05 (Aug. 21, 2025).  No further documents have been filed since the stay expired on September 22, 2025.

## II.    FACTUAL ALLEGATIONS

As noted above, Riley's second amended complaint remains the operative pleading in this case.  According to the allegations in the second amended complaint, Riley was housed in Waymart State Correctional Institution ("SCI-Waymart")'s Restricted Housing Unit ("RHU") in late September 2019.  (Doc. No. 58 ¶¶ 40–41.)  Riley informed Defendants Hendrick, Manley,

Schuman, Odell, Bauer, Gardner, and Keller, that he did not want to be placed in "certain RHU recreational pens" because some of the pens had severe structural damage, including cracks and holes in the concrete. (Id. ¶ 41.) Riley was purportedly "unaware at the time exactly what pens had damages & which ones did not." (Id. ¶ 42.) The complaint notes, however, that other inmates had also complained about the condition of the pens. (Id.) Riley purportedly told Defendant Hendrick that he did not wish to be placed in pens that had holes in the concrete, but Hendrick purportedly responded, "Shut up and deal with it." (Id.)

On September 27, 2019, sometime between 7:00 and 8:30 a.m., Defendants Manley, Schuman, Odell, Bauer, Gardner, and Hendrick began to allow RHU inmates outside for recreation time. (Id. ¶ 44.) Riley was transported from his cell by the Defendants and taken to an RHU recreation pen. (Id. ¶ 45.) The six Defendants involved in conducting the recreation time were purportedly aware that the pen he was taken to had several large cracks and holes in the concrete. (Id. ¶ 46.) As Riley exercised in the pen, his foot allegedly became caught in a hole in the concrete that he had not seen, which caused him to twist his ankle, fall headfirst into the fence, and then fall backwards on his back and head. (Id. ¶ 48.) Inmates who witnessed the fall from other nearby recreation pens immediately called for correctional officers to help Riley. (Id. ¶ 49.) Riley purportedly suffered a sprained ankle, sprained spinal cord, sprained lumbosacral region, nerve damage in his lower back, frequent back spasms, bruises on his head, headaches, nick stiffness and soreness, and severe pain in his back, neck, ankle, and head. (Id. ¶ 51.) Riley also purportedly had difficulty walking after the fall. (Id.) The second amended complaint alleges that Defendants Miller, Cirelli, Grillo, Schweinsburg, Gibson, Rishel, and Hendrick, who were employed in supervisory positions in the prison, were aware of structural damages to RHU recreation pens prior to Riley's injury. (Id. ¶ 116.)

4

Defendant Manley contacted the prison medical department, and two nurses from the prison allegedly brought a wheelchair to the RHU to transport Riley.  (Id. ¶ 52.)  Rather than taking Riley to the medical unit, however, an unknown nurse purportedly examined Riley's injuries in the hallway and then transported him back to his cell in the RHU, where the nurse placed him on the bed.  (Id. ¶ 53.)  Riley complained to the nurse and another nurse who was present that he was dizzy, and they stated that they would give him some Tylenol.  (Id. ¶ 54.)  At approximately 11:00 a.m., a different nurse came to Riley's cell, gave him two Tylenols, took pictures of his wounds, and examined his back.  (Id. ¶ 55.)  Riley complained about the pain he was experiencing, and the nurse told him to get some rest, that he would be given ice, and that he should "walk it off."  (Id.)  Later that day, Riley told Defendant Manley that he needed to go to the medical unit because he was in extreme pain.  (Id. ¶ 56.)  Manley responded that someone from the medical unit would come back, but nobody did.  (Id.)

Sometime between 4:00 and 6:00 p.m. that day, Riley began experiencing extremely painful back spasms that caused him to scream.  (Id. ¶ 57.)  Correctional officer Judge, who was passing Riley's cell, called for immediate medical assistance.  (Id. ¶ 58.)  Staff members from the medical unit and several correctional officers came to the cell and transported him to the medical unit on a stretcher.  (Id.)  Riley was subsequently taken to Wayne Memorial Hospital by ambulance.  (Id. ¶ 59.)  He was given pain medication at the hospital and discharged later that night, at which point he was transported back to SCI-Waymart and placed in a medical isolation cell.  (Id.)

Riley was examined by Defendant DeWarren, a doctor in the prison, on the following morning, September 28, 2019.  (Id. ¶ 60.)  DeWarren stated that he had examined Riley's x-rays and determined that no bones were broken and told Riley that he was having him transferred

back to the RHU.  (Id. ¶ 61.)  Riley purportedly complained about the pain he was suffering, but DeWarren allegedly disregarded the complaints.  (Id.)  Riley was taken to the RHU in a wheelchair by Defendant Hendrick and three other individuals sometime between 10:30 and 10:55 a.m. that morning.  (Id. ¶ 62.)  When he arrived at his cell, they carried him into the cell and placed him on his bed.  (Id.)

At around 5:30 p.m. on September 28, 2019, Riley informed correctional officer Galea that he needed medical assistance because he was in extreme pain and could not move due to back spasms.  (Id. ¶ 63.)  Galea allegedly ignored his complaints for several hours.  (Id.)  At 7:30 p.m., Defendant correctional officer Martin ("Martin") came to Riley's cell and asked him to come to the door to be handcuffed.  (Id. ¶ 64.)  Riley told Martin that he could not do so because he could not move.  (Id.)  Martin told Riley that he would not allow medical staff to come to the cell to treat him if he did not come to the door for handcuffing.  (Id. ¶ 65.)  Riley repeatedly told him that he could not move.  (Id.)  Martin allegedly refused to assist Riley and refused to allow medical staff to enter the cell.  (Id.)  Martin returned to the cell approximately an hour later and again told Riley to come to the door to be handcuffed.  (Id. ¶¶ 66–67.)  Riley attempted to go to the door, but his back and legs "gave out," which caused him to fall, strike his head on the cell door, and lose consciousness.  (Id. ¶ 68.)  When he regained consciousness, he was in extreme pain and extremely dizzy.  (Id.)

While Riley was unconscious, Martin and five other officers decided to conduct a cell extraction operation.  (Id. ¶ 69.)  The officers allegedly entered the cell, held a shield over Riley, handcuffed and restrained him, picked him up from the floor, threw him onto the bed, and held him down.  (Id.)  Riley regained consciousness on the bed and told Martin and the other officers that they were hurting him.  (Id. ¶ 70.)  Riley was given Toradol for his pain and removed from

his cell on a stretcher.  (Id. ¶ 71.)  Riley remained restrained during this time at Martin's orders.

(Id.)  He was subsequently taken to Geisinger Hospital's emergency room.  (Id. ¶ 72.)  He was

given pain medication and discharged the following morning, at which point he was taken to an

isolation cell in SCI-Waymart's infirmary.  (Id. ¶ 73.)  Later that morning, Defendant DeWarren

purportedly accused Riley of "faking" his injuries, again noting that his x-rays showed no

fractures.  (Id. ¶ 74.)  Riley told DeWarren that he could not stand because of his injuries.  (Id.)

Riley requested an MRI or nerve testing, but DeWarren denied the requests.  (Id.)  DeWarren

attempted to return Riley to the RHU, but Riley allegedly "refused."  (Id. ¶ 75.)

    On September 30, 2019, Defendant Sergeant Oliver refused to let a nurse named

"Robert" into Riley's cell to give Riley his prescribed medication.  (Id. ¶ 76.)  Both Oliver and

Robert were purportedly aware of Riley's two recent hospital visits, but Oliver nonetheless

ordered Riley to come to the cell door to get his medication and evening meal.  (Id. ¶ 76.)  Riley

told Oliver that he physically could not come to the door and Oliver responded that if he did not

come to the door he would be marked down as refusing the medication and meal.  (Id. ¶ 77.)

Riley attempted to get out of bed to go to the door, but immediately fell and hit his head and

back.  (Id. ¶ 78.)  He twice attempted to get up, but both times his legs "gave out" and caused

him to fall.  (Id.)  Oliver refused to give Riley his medication or meal and left the cell as Riley

was on the floor screaming for help.  (Id.)  During this exchange, Robert purportedly reminded

Oliver that Riley could not walk, but Oliver allegedly responded, "I don't care he's a level 5

inmate."  (Id.)

    Later that night, sometime between 6:00 and 7:00 p.m., Riley spoke with Defendants

Captain Horvath ("Horvath") and Lieutenant Smith ("Smith") while they were making rounds in

the RHU.  (Id. ¶ 79.)  Riley told them that he was unable to walk.  (Id.)  Riley told them that

Oliver had refused to give him food and medication despite his inability to walk to the door of his cell. (Id. ¶ 80.) Smith allegedly stated that he "didn't care" about Riley's injuries and that he would be ordering officers not to enter Riley's cells for any reason, including providing meals and medication. (Id.)

A day or two later, Riley informed Defendant Dr. Lisiak ("Lisiak") that officers and medical staff were refusing to bring him medication in his cell. (Id. ¶ 81.) Lisiak stated that he would attempt to fix the problem, but that the medical department was already aware of his injuries including his inability to walk. (Id.) Lisiak also purportedly stated that he would order a shower seat to help Riley bathe, but never did so. (Id. ¶ 83.) Riley purportedly sent multiple requests to Defendant Correctional Healthcare Administrator Hartman ("Hartman") for a shower seat after this conversation, but Hartman also did not provide the shower seat. (Id. ¶ 84.) Hartman purportedly stated that she would speak to Lisiak about it. (Id. ¶ 85.) Riley stated that he had already spoken with Lisiak and that Lisiak had said he would be provided a shower seat, but Hartman continued to not order the shower seat. (Id.) Riley continued to request a shower seat from Correctional Officers Oliver, Williams, and Horvath from September 30, 2019, to October 14, 2019, but his requests were ignored or denied. (Id. ¶¶ 86–87.) During this time, Riley twice fell in the shower, on October 3, 2019, and October 7, 2019, which exacerbated his injuries and pain. (Id. ¶ 88.) Riley purportedly called for help on both occasions, but no staff members assisted him. (Id. ¶ 89.) Riley told correctional and medical staff members about his falls, but they purportedly responded that it "wasn't their problem," and stated, "if you['re] not bleeding you'll be okay." (Id. ¶ 90.)

On October 4, 2019, Riley had a physical therapy session with physical therapist Ron Siejack ("Siejack") in an infirmary room. (Id. ¶ 91.) Defendants Hartman and Lisiak were also

present.  (Id.)  Lisiak and Hartman purportedly stated that Riley would be given monthly physical therapy session with Siejack.  (Id.)  Riley asked Lisiak to order an MRI.  (Id.)  Lisiak purportedly stated that he would do so along with "other nerve testing."  (Id. ¶ 92.)  An MRI, however, was allegedly never performed.  (Id. ¶ 93.)

On October 10, 2019, the prison's Program Review Committee ("PRC"), which consisted of Defendants Cirelli, Grillo, and Hendricks, made rounds in the infirmary unit, where they spoke with Riley.  (Id. ¶ 94.)  Riley told them that "all his privileges" had been suspended, such as recreation, commissary, and phone calls, and asked why this was the case when he was granted these privileges prior to his injuries.  (Id. ¶ 95.)  He also asked them if his personal property could be brought to him.  (Id.)  The Defendants allegedly stated, "All your privileges were suspended and will remain suspended until you stop faking injuries and stop writing bullshit grievances."  (Id. ¶ 96.)  The Defendants also purportedly told him that he was not allowed to have any personal property in the infirmary.  (Id.)  Riley asked them why they were punishing him when his injuries were legitimate, and Grillo allegedly responded, "because you['re] a fake and we have the power to do that."  (Id. ¶ 97.)  Riley continued to be denied all commissary, phone calls, and personal property between October 1, 2019, and October 16, 2019.  (Id. ¶ 98.)  Riley sent several requests to unnamed staff members about this situation, but his requests were allegedly ignored.  (Id. ¶ 99.)

On October 15, 2019, Riley was released from the infirmary and taken back to the RHU in a wheelchair.  (Id. ¶ 100.)  On October 16, 2019, the medical unit ordered that Riley was to be allowed a wheelchair for movement outside of his cell, but his request for a cane for movement in his cell was denied.  (Id. ¶ 101.)

On October 31, 2019, correctional officers Manley and Gule came to Riley's cell and informed him that Defendant Hendrick wished to speak with him in the RHU law library. (Id. ¶ 102.) They escorted him to the law library in his wheelchair, at which point Gule left the room and Hendrick entered. (Id. ¶ 103.) Hendrick then allegedly threatened Riley with "serious bodily harm, torture, and even death" because of the grievances Riley had filed against prison staff. (Id. ¶ 104.) The second amended complaint alleges that during this exchange, Hendrick gave Riley the following monologue:

> You['re] acting like a fucking inmate and not a fucking convict and if you don't stop writing all these bullshit grievances I will do everything in my fucking power to make your stay down here a living fucking hell. I don't give a fuck, I will find anything to write you up for, I will take away all you[r] fucking privileges, and I will put you in the RHU yard for you[r] one h[ou]r exercise by your fucking self if you don't fall back on writing all these fucking grievances. I don't give a fuck about the policy, I don't give a fuck about the master commissary sheet, you['re] not getting no fucking hair grease, lotion, or any of that other shit because I don't allow it and this is my fucking RHU and I override the policy and say it's a security risk. I have the power to do that and the superintendent and deputies will back me up. I've been grievanced before and I win every time. I've been running this RHU since I was a CO1, to a sergeant, and now as a lieutenant and I do what the fuck I want and I've been doing so for 20 y[ea]rs. You being a petty ass inmate, writing all of these petty ass grievances, that I will make sure gets denied as frivolous, instead of acting like a fucking convict who's doing a wheels bid. I'm telling you now if you continue to make my job harder I'm going to make your bid harder and do everything in my power to take everything you have and personally make sure you get a shit load of DC time and torture you for your entire fucking stay at SCI Waymart. I'm the property lieutenant also and I'll lose all your fucking property and you will leave here with nothing if you don't fall back and stop writing grievances. You['re] not getting no phone calls or extended commissary. That's a privilege that I can give and take it away anytime I want so I'm warning you Riley, stop writing grievances or I will fuck you up and fuck you over for the rest of your stay in my RHU and don't think I can't do it because believe me I done killed motherfuckers bigger [and] stronger than you. I can kill you and get away with it. I've done it before.

(Id. ¶ 105.) Riley was purportedly too scared to respond to Hendrick, but subsequently filed a grievance about the incident. (Id. ¶ 106.)

On November 1, 2019, Riley was scheduled for a physical therapy appointment, but was never taken to the medical unit for the appointment.  (Id. ¶ 107.)  Defendant Hartman purportedly falsified documents to indicate that Riley refused to come to the appointment.  (Id. ¶ 109.)  The second amended complaint asserts that before an inmate may refuse a medical appointment, he must sign a waiver form, and that there is no record of Riley having signed such a form.  (Id. ¶ 112.)

On November 4, 2019, Defendant correctional officer Keller ("Keller") allegedly opened the "wick slot" of Riley's cell and threatened to file false misconduct charges against Riley if he attended recreation time.  (Id. ¶ 113.)  Keller purportedly stated, "If you don't withdraw them grievances you['re] not getting no yards [and] since you got the sergeant involved I'm giving you a write up if you sign up for any yards.  By the way don't be surprised if you get fucked up." (Id. ¶ 114.)  Riley purportedly attempted to tell Keller that he had not done anything wrong, but Keller slammed the slot shut and walked away.  (Id.)

Riley purportedly filed sick call requests to Defendant Lisiak on November 3, November 5, November 7, November 8, and November 9, stating that the Ibuprofen Lisiak had prescribed for Riley's pain was no longer effective.  (Id. ¶ 120.)  Lisiak purportedly ignored the requests. (Id. ¶ 121.)

On November 11, 2019, Riley was transferred from SCI-Waymart to SCI-Dallas in a wheelchair-accessible ambulance and placed in a psychiatric observation cell. (Id. ¶¶ 126–27.) On November 12, 2019, Defendants Bohinski, Miller, and Martin informed Riley that he was slated to be transferred to SCI-Smithfield, but that his transfer was on hold until his medical condition improved.  (Id. ¶ 128.)  Miller asked whether he would be willing to withdraw some of his grievances, and Riley stated that he would not do so.  (Id. ¶ 130.)  Bohinski then purportedly

stated, "Well until you can walk again you'll be right here inside this cell with nothing, and when you sign off we'll talk." (Id. ¶ 131.)[1]  Riley complained that he should be given certain privileges, but Miller stated, "you heard why my officer said, you'll get nothing until further notice." (Id. ¶¶ 132–33.)

On November 6, 2019, Riley purportedly received a report and recommendation from a United States Magistrate Judge stating that a pending habeas corpus petition he had filed would be dismissed in fourteen (14) days if he did not respond. (Id. ¶ 134.)  Riley immediately wrote requests for access to his legal documents and the law library to meet the deadline. (Id. ¶ 135.) Defendants Bohinski and Williams allegedly ignored the requests. (Id. ¶ 136.)  Riley allegedly asked Defendants Amaral and Spear for access to the law library and his legal documents while they were making their rounds in the prison. (Id. ¶ 137.)  Amaral purportedly stated that he would "see what he could do" but stated, "don't count on it" and that he was not "making any promises." (Id. ¶ 138.)  Spear then stated, "It's nothing I can do about that, I guess you gone [sic] miss that deadline I'm just following orders." (Id. ¶ 139.)  Plaintiff's habeas corpus petition was eventually dismissed. (Id. ¶ 144.)

Riley was purportedly denied access to the yard, the day room, and any out of cell movement for the entire time he was in the psychiatric observation cell. (Id. ¶ 140.)  He repeatedly asked staff members about this, but Defendant Bohinski purportedly told him, "Withdraw them grievances and start walking [and] you can get yard at your next jail." (Id. ¶ 141.)  Defendant Sankey purportedly told Riley that his requests were "above [his] pay grade." (Id.)

---

[1] The Court takes judicial notice that "signing off" on a grievance is a term frequently used by prisoners and staff members to refer to the inmate withdrawing the grievance.

During Riley's time in the psychiatric observation cell, his window was left slightly open despite the cold temperatures outside, and the heat in his cell was left off.  (Id. ¶ 146.)  Riley repeatedly asked Defendants Amaral, Spear, and Williams for extra clothes and for clean clothes after his showers, but his requests were denied.  (Id. ¶ 147.)  Riley repeatedly wrote grievances and letters to supervisory officials in the prison about this situation, but his correspondence was allegedly ignored.  (Id. ¶ 148–54.)  Riley was purportedly denied a shower by several non-Defendant prison staff members on December 13, 2019.  (Id. ¶ 156.)

On November 20, 2019, Defendant Dr. Prince ordered that Riley was to receive physical therapy walks every day to aid his rehabilitation from his injuries.  (Id. ¶ 158.)  Correctional staff were directed to assist with this physical therapy due to Riley's security classification.  (Id. ¶¶ 159–60.)  Correctional staff members, however, refused to comply with Dr. Prince's order and refused to assist with the walks.  (Id. ¶¶ 161–62.)  As a result, Riley was purportedly denied physical therapy walks on seven non-consecutive days in November and December of 2019.  (Id. ¶ 167.)  Riley informed Prince that officers were not following his order, but Prince stated that he could not compel the officers to comply.  (Id. ¶ 169.)  Riley was transferred to SCI-Smithfield on December 27, 2019.  (Id. ¶ 171.)

Based on the foregoing allegations, the second amended complaint asserts the following claims for relief: (1) deliberate indifference to a risk of harm to Riley in violation of the Eighth Amendment by Defendants Miller, Manley, Odell, Schuman, Bauer, Gardner, Hendrick, Cirelli, Grillo, Schweinsburg, Gibson, and Rishel; (2) deliberate indifference to a serious medical need in violation of the Eighth Amendment by Defendants Ransom, Bohinski, Miller, Aponte, Williams, Spear, Amaral, Sankey, Martin, Oliver, Smith, Horvath, Hartman, Lisiak, DeWarren; (3) retaliation in violation of the First Amendment by Defendants Hendrick, Martin, Keller,

Cirelli, Grillo, Miller, Aponte, Bohinski, Sankey, Spear, Amaral, Mitkowski, Valentine,

Williams; (4) deliberate indifference to the conditions of Riley's confinement in violation of the

Eighth Amendment by Defendants Ransom, Bohinski, Miller, Aponte, Williams, Spear, Amaral,

Sankey, Mitkowski, and Valentine; (5) negligence by Defendants Miller, Cirelli, Grillo,

Schweinsburg, Gibson, Rishel, Hendrick, Manley, Schuman, Odell, Bauer, Gardner, Williams,

Oliver, Horvath, and Smith; (6) medical malpractice/professional negligence by Lisiak,

DeWarren, and Hartman; (7) cruel and unusual punishment in violation of the Eighth

Amendment by all Defendants; (8) interference with access to the courts in violation of the First

Amendment by Defendants Miller, Bohinski, Williams, Amaral, and Spear; (9) violation of

Riley's right to equal protection under the Fourteenth Amendment by all Defendants; (10)

excessive force in violation of the Eighth Amendment by Defendant Martin; and (11) failure to

accommodate a disability under the Americans with Disabilities Act ("ADA") and the

Rehabilitation Act ("RA") by Defendants Miller, Grillo, Martin, Hendrick, Smith, Oliver,

Aponte, Williams, Spear, Amaral, Sankey, Martin, Prince, Mitkowski, Ransom, Wetzel, and the

DOC; (Id. ¶¶ 199–288.)

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of

the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d

224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a

plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure

8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled

to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure

12(b)(6) for its "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims are facially plausible.  See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct: "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, the Third Circuit has identified the following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the elements that a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010) (internal citations and quotation marks omitted).

The Third Circuit has specified that in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the

complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).  An undisputedly authentic document attached as an exhibit to a motion to dismiss by a defendant may be the basis to grant the motion to dismiss if the contents of the document contradict the plaintiff's allegations.  See Pension Benefit Guar. Corp., 998 F.2d at 1196 (noting that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document" because "otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied").

In the context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97, 106 (1976).  Pro se complaints, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle, 429 U.S. at 106).

### B.    Section 1983 Standard

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon,

16

331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–

85 (2002)).  To state a cause of action under Section 1983, a plaintiff must allege that: (1) the

conduct complained of was committed by persons acting under color of state law; and (2) the

conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United

States.  See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West

v. Atkins, 487 U.S. 42, 48 (1988)).

## IV.    DISCUSSION

Two motions to dismiss are pending before the court.  (Doc. Nos. 98–99.)  The Medical

Defendants argue that the claims against them should be dismissed for failure to state a claim

upon which relief may be granted.  (Doc. No. 101.)  All other Defendants ("DOC Defendants")

argue that the second amended complaint should be dismissed because it violates the joinder

rules set by Federal Rule of Civil Procedure 20.  (Doc. No. 100.)  The Court will begin its

analysis with Riley's motion for extension of time to file a brief in opposition to the pending

motions to dismiss.  The Court will then address the DOC Defendants' joinder argument before

addressing the Medical Defendants' arguments.

### A.    Motion for Extension of Time

At the outset, the Court will deny Plaintiff's motion for extension of time.  Plaintiff filed

the motion for extension of time to file a brief in opposition to the motions to dismiss on

November 26, 2024, but has not yet filed a proposed brief.  (Doc. No. 104.)  Granting the motion

at this point would effectively grant Plaintiff an extra year to file his opposition brief.  Given that

many of the legal arguments in Defendants' motions and supporting briefs were first raised

nearly four years ago, see (Docs. 22–23, 32–33), the Court finds that an additional extension of

time is not warranted.  Plaintiff has had ample opportunity to respond to Defendants' arguments

17

and has repeatedly failed to do so.  The Court accordingly considers the motions to dismiss ripe and addresses Defendants' arguments below.

### B.    Joinder

Under Federal Rule of Civil Procedure 20, claims against multiple defendants may be joined in the same action only if:

> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

> **(B)** any question of law or fact common to all defendants will arise in the action.

See Fed. R. Civ. P. 20(a)(2).

Misjoinder of claims is not grounds for dismissal of the entire action.  See Fed. R. Civ. 21; Sabolsky v. Budzanoski, 457 F.2d 1245, 1249 (3d Cir. 1972).  Federal Rule of Civil Procedure 21 provides two options when a plaintiff has misjoined claims: (1) "drop" the misjoined parties from the case on "just terms" or (2) sever the claims into separate cases.  See Fed. R. Civ. P. 21; DirecTV, Inc. v. Leto, 467 F.3d 842, 845 (3d Cir. 2006).  When a party is dropped under Rule 21, he is dismissed from the case without prejudice.  See DirecTV, Inc., 467 F.3d at 845 (citing Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1068 (3d Cir. 1979)).  The statute of limitations for claims against that defendant is not tolled because the initial complaint is treated "as if it never existed."  See id. (quoting Brennan v. Kulick, 407 F.3d 603, 606 (3d Cir. 2005)).  When, on the other hand, the claims are severed, "the suit simply continues against the severed defendant in another guise."  See id. (citing White v. ABCO Eng'g Corp., 199 F.3d 140, 145 n.6 (3d Cir. 1999)).

District courts have discretion to choose whether misjoined claims should be dismissed or severed.  See id.  Courts may only dismiss misjoined claims, however, if doing so would be just,

"that is, if doing so 'will not prejudice any substantial right'" of the plaintiff. See id. (internal emphasis omitted) (quoting Sabolsky, 457 F.2d at 1249). "Hence, a court must analyze the consequences of a dismissal on a claimant's ability to meet the statute of limitations prior to choosing dismissal over severance." Id.

The DOC Defendants argue that Riley's second amended complaint should be dismissed because it violates Federal Rule of Civil Procedure 20 by joining a variety of claims that do not share any common thread in a single lawsuit. (Doc. No. 100.) The Court finds this argument unavailing. Although Plaintiff's claims address a wide variety of purported wrongdoing over several months at two different prisons, there is a clearly comprehensible theory linking all of these claims that permits joinder under Rule 20: Riley alleges that he suffered physical injuries when he fell in a RHU recreation pen and Defendants at two separate prisons violated his civil rights in a variety of ways because they believed that he was faking or exaggerating his injuries. Thus, because the Court concludes that Riley's second amended complaint does not violate Rule 20 and the DOC Defendants have not otherwise argued for dismissal of Riley's claims on their merits,[2] the Court will deny the DOC Defendants' motion to dismiss.

---

[2] The DOC Defendants assert in two separate footnotes that it is implausible that Defendants in SCI-Dallas would retaliate against Riley based on grievances he filed at a previous institution. See (Doc. No. 100 at 3 n.3, 6 n.5). This argument has not been properly asserted. See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (noting that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."). Furthermore, even it was properly asserted, it is meritless. The DOC Defendants' argument essentially contends that there is no basis in the second amended complaint to infer causation to support Riley's retaliation claim against Defendants at SCI-Dallas, but no such inference is necessary because Riley alleges that Defendant Bohinski directly told him that the Defendants were retaliating against him based on his grievances at SCI-Waymart. See (Doc. 58 ¶ 131 (alleging that Bohinski told Riley, "Well until you can walk again you'll be right here inside this cell with nothing, and when you sign off we'll talk); id. ¶ 141 (alleging that Bohinski told Riley, "Withdraw them grievances and start walking [and] you can get yard at your next jail")). Although the DOC Defendants may wish to argue that Bohinski never made such a clear statement of retaliatory intent, at this stage the Court must accept Riley's allegations as true.

### C.    Deliberate Indifference to Serious Medical Need

Turning to the claims against the Medical Defendants, the Court will first consider Riley's claim that the Medical Defendants were deliberately indifferent to a serious medical need in violation of his Eighth Amendment rights.  To state a claim for deliberate indifference, a plaintiff must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention."  See Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  See Farmer v. Brennan, 511 U.S. 825, 837 (1994).  "A plaintiff's mere disagreement as to the proper medical treatment" is not sufficient to support a deliberate indifference claim.  See Lanzaro, 834 F.2d at 346.  Courts will not "second-guess the propriety or adequacy of a particular course of treatment" because such a decision is left to the professional judgment of the medical providers.  See Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979).

In this case, Riley asserts that the Medical Defendants were deliberately indifferent to his serious medical needs in treating the injuries he suffered in his initial and subsequent falls.  The text of the second amended complaint, however, shows that the Medical Defendants promptly provided medical care to Riley, prescribed him medication and physical therapy to treat his

injuries, and sent him to an outside hospital for additional care on multiple occasions.[3]  Because

it is clear from these factual allegations that the Medical Defendants provided treatment for

Riley's injuries, his claims amount to a mere disagreement with the course of treatment, which is

not an actionable claim for violation of the Eighth Amendment.  See Lanzaro, 834 F.2d at 346.

### D.    Malpractice

The Court will next consider Riley's malpractice claim.  The Medical Defendants seek to

dismiss this claim based on Riley's failure to file a certificate of merit.  (Doc. No. 101 at 31–32.)

Under Pennsylvania Rule of Civil Procedure 1042.3, a plaintiff must file a certificate of merit in

any case in which the plaintiff alleges that "a licensed professional deviated from an acceptable

professional standard" within sixty days after filing the complaint.  See Pa. R. Civ. P. 1042.3.

Rule 1042.3 is substantive state law that must be applied by federal courts.  See Liggon-Redding

v. Estate of Sugarman, 659 F.3d 258, 264–65 (3d Cir. 2011).

Here, Riley filed his complaint on September 24, 2021, and has not yet filed a certificate

of merit in connection with his malpractice claim.  Riley filed a motion for extension of the

deadline to file a certificate of merit on November 26, 2024.  (Doc. No. 105.)  Under

Pennsylvania Rule of Civil Procedure 1042.3(d), however, a motion to extend the deadline for a

certificate of merit must be filed "by the thirtieth day after the filing of a notice of intention to

enter judgment of non pros on a professional liability claim under Rule 1042.6(a)."  See Pa. R.

Civ. P. 1042.3(d).  Here, the Medical Defendants first provided notice of their intent to seek

dismissal for failure to file a certificate of merit on March 3, 2022, in response to Riley's first

amended complaint.  See (Doc. 50 at 25–26).  Thus, any motion for extension of time to file a

---

[3] Although several physical therapy sessions allegedly did not happen because correctional
officers refused to help Riley, this failure cannot be attributed to the Medical Defendants, who
did not have supervisory authority over the correctional officers.

certificate of merit needed to be filed no later than April 2, 2022, and therefore his November 26, 2024, motion for extension of time is untimely.  Accordingly, because Riley has not filed a certificate of merit and the deadline for filing one has expired and can no longer be extended, his malpractice claim will be dismissed.

> E.    ADA and RA Claims

The Court will next consider Riley's claims for failure to accommodate his disability in violation of Title II of the ADA and Section 504 of RA against the Medical Defendants.  These claims fail to state a claim upon which relief may be granted.

To begin with, Riley cannot seek individual liability under Section 504.  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 804 (3d Cir. 2007) ("Suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals." (citing Emerson v. Thiel Coll., 296 F.3d 184, 190 (3d Cir. 2002))); Doe #1 v. Del. Valley Sch. Dist., 572 F. Supp. 3d 38, 78 n.12 (M.D. Pa. 2021) ("Although Plaintiffs' Complaint alleges violations of the ADA and Section 504 against all Defendants, Plaintiffs may only bring such claims against the School District, not the individual Defendants acting in their individual capacity." (citations omitted)).

As for Title II of the ADA, the Court recognizes that the Third Circuit Court of Appeals has not addressed whether Title II permits individual liability in a published opinion.  See Emerson, 296 F.3d at 189 (3d Cir. 2002) (concluding that individual defendants were not subject to individual liability under Title III of the ADA, and pointing out that "[t]his result comports with decisions of other courts of appeals holding individuals are not liable under "Titles I or II of the ADA, which prohibit discrimination by employers and public entities respectively"); see also Durham v. Kelley, 82 F.4th 217, 224 n.12 (3d Cir. 2023) ("This Court has not squarely addressed

the question of whether claims may be brought against government officers in their individual capacities under Title II of the ADA." (citation omitted)).  Nevertheless, the Third Circuit has done so in several unpublished opinions.  See, e.g., Kokinda v. Pa. Dep't of Corr., 779 F. App'x 938, 942 (3d Cir. 2019) (unpublished) (concluding that plaintiff's "claims for individual damages liability under Title II of the ADA fail for the simple reason that there is no such liability" (citations omitted)); Bowens v. Wetzel, 674 F. App'x 133, 136 (3d Cir. 2017) (unpublished) (noting that "the District Court could have properly followed the holdings of those circuits which have concluded that there is no individual damages liability under Title II of the ADA, which provides an additional basis to affirm the dismissal of this claim" (citations omitted)); see also Constantine v. N.J. Dep't of Banking & Ins., No. 23-2423, 2024 WL 1988829, at *6 n.9 (3d Cir. May 6, 2024) ("We have apparently not addressed whether the ADA's anti-retaliation provision provides for individual liability.").  District courts within the Third Circuit have reached similar conclusions.  See Snider v. Pa. DOC, 505 F. Supp. 3d 360, 405–06 (M.D. Pa. 2020) ("Individuals are not liable under Title II or the [RA]." (citation omitted)).  Accordingly, the Court concludes that individual liability claims are not actionable under Section 504 of the RA or Title II of the ADA, and Plaintiff's ADA and RA claims will therefore be dismissed.

## F.    Equal Protection Claim Against the Medical Defendants

Turning next to Riley's equal protection claim, the Equal Protection Clause of the Fourteenth Amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."  See U.S. Const. amend. XIV, § 1.  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 475 U.S. 202, 216 (1982)).  "[T]o bring a successful equal protection claim, plaintiffs 'must demonstrate

that they received different treatment from that received by other individuals similarly situated.'" See Childrens Health Defense, Inc. v. Rutgers, the State Univ. of N.J., 93 F.4th 66, 84 (3d Cir. 2024) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 196 (3d Cir. 2009)).  At the pleading stage, a plaintiff must make nonconclusory allegations that he and the similarly situated individuals who were allegedly treated differently from him are "alike 'in all relevant respects.'"  See id. (quoting Harvard v. Cesnalis, 973 F.3d 190, 205 (3d Cir. 2020)).  Here, Riley has not offered anything other than conclusory statements to allege the existence of similarly situated individuals who were treated differently.  See (Doc. No. 59 ¶ 280 ("Plaintiff was treated differently than inmates in similar situations by the Defendants in this action.")).  Hence, his equal protection claim against the Medical Defendants will be dismissed.

G.    Claims Against Wetzel and the DOC

Finally, the Court will address Riley's claims against the DOC and John Wetzel, the DOC's secretary at the relevant time.  These Defendants have not been served with process and accordingly have not joined in the motions to dismiss or otherwise responded to Riley's second amended complaint, but the Court analyzes the claims against them pursuant to the screening provision of 28 U.S.C. § 1915A.[4]

The claims against both the DOC and Wetzel will be dismissed.  The DOC is not a proper defendant to this action.  For a defendant to be held liable for a violation of a plaintiff's constitutional rights under Section 1983, the defendant must be a "person" for purposes of the statute.  See 42 U.S.C. § 1983.  The DOC is not considered a person that may be sued under

---

[4] Under 28 U.S.C. § 1915A, federal district courts must "review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."  See 28 U.S.C. § 1915A(a).  If a complaint fails to state a claim upon which relief may be granted, the Court must dismiss the complaint.  See id. § 1915A(b)(1).

Section 1983. See Curtis v. Everette, 489 F.2d 516, 521 (3d Cir. 1973) accord Pettaway v. SCI Albion, 487 F. App'x 766 (3d Cir. 2012) (unpublished).

The claims against Wetzel will also be dismissed because Riley has not alleged his personal involvement. A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation. See Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018). The defendant's personal involvement cannot be based solely on a theory of respondeat superior. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence. See id. Here, there are simply no allegations of Wetzel personally directing or acquiescing in the other Defendants' alleged wrongdoing, and Riley appears to be suing Wetzel solely because of his supervisory role as the secretary of the DOC. This is not a sufficient basis to allege personal involvement. See Rode, 845 F.2d at 1207. Accordingly, Riley's claims against the DOC and Wetzel will be dismissed for failure to state a claim upon which relief may be granted.[5]

### H.    Leave to Amend

Courts are cautioned that because of the applicable pleading standard, a plaintiff should generally be granted leave to amend before dismissing a complaint that is merely deficient. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). The federal rules allow for liberal amendment in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." See Foman v. Davis, 371 U.S. 178, 182 (1962) (citations and internal

---

[5] Riley's currently pending motion for leave to amend seeks to amend his complaint to "properly add" the DOC and Wetzel to the docket of the case as defendants. (Doc. No. 103.) Because there does not appear to be any basis for these Defendants to be added to the case, the Court will deny the motion for leave to amend as futile. Plaintiff's proposed amended complaint (Doc. No. 109) will accordingly be stricken from the record.

quotations omitted).  The Court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment."  See id.  Based on the foregoing, the Court finds that leave to amend would be futile with respect to Riley's claims against the Medical Defendants because the allegations in the second amended complaint establish that the Medical Defendants were not deliberately indifferent to a serious medical need, there does not appear to be any basis to conclude that similarly situated individuals were treated differently from Riley, and the other claims fail as a matter of law.  The Court will similarly deny leave to amend as futile with respect to the claims against the DOC and Wetzel because the DOC is not a proper defendant and there does not appear to be any basis to infer that Wetzel was personally involved in the alleged civil rights violations.

## V.    CONCLUSION

For the foregoing reasons, the Court will: (1) grant the Medical Defendants' motion to dismiss; (2) dismiss Riley's claims against the Medical Defendants with prejudice; (3) deny the DOC Defendants' motion to dismiss; (4) dismiss the claims against the DOC and Wetzel pursuant to 28 U.S.C. § 1915A; (5) deny Riley's motion for extension of time, motion for leave to amend, and motion for leave to file a certificate of merit; (6) strike Riley's proposed third amended complaint from the record; and (7) set a case management schedule to govern this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania